UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARCOS GRAY (K-69488), | ) |
|       Plaintiff, | ) |
| v. | ) No. 11 C 7097 |
| | ) Judge Rebecca R. Pallmeyer |
| MARCUS HARDY, | ) |
|       Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marcos Gray, an Illinois prisoner currently incarcerated at the Stateville Correctional Center, filed this 42 U.S.C. § 1983 action against Stateville's Warden, Marcus Hardy. Plaintiff alleges that numerous conditions of his confinement at Stateville constitute cruel and unusual punishment in violation of the Eighth Amendment. Defendant now moves for summary judgment [40], arguing that the conditions Plaintiff experienced do not rise to the level of a constitutional violation. For the reasons stated below, Defendant's motion for summary judgment is granted. Six months after filing his response memorandum in opposition to summary judgment, Plaintiff filed a motion [51] seeking to join two other Stateville inmates to this litigation as a "class action." That motion is denied as moot.

## BACKGROUND

Plaintiff Marcos Gray is currently an inmate at Stateville Correctional Center ("Stateville" or "prison"). (Def.'s 56.1 [42] ¶ 1.) Defendant Marcus Hardy has been the Chief Administrative Officer, or Warden, of Stateville since December 2009. (*Id.* ¶ 3.) Gray claims that the conditions of his incarceration threaten his health and safety such that his confinement constitutes cruel and unusual punishment. (Compl. [1] ¶ 9.) Specifically, Plaintiff objects to the following conditions: inadequate access to cleaning supplies, exposure to lead paint and mold, inadequate ventilation,

bird and insect infestations, twenty-four hour lighting in his cell, contaminated drinking water, and double-man cells.

Although apprised of his obligation to do so [43], Plaintiff failed to properly respond to Defendant's Local Rule 56.1(a) statement of uncontested material facts. Plaintiff did submit a response to Defendant's memorandum in support of summary judgment, but his response fails to directly address Defendant's 56.1 statements of fact. Given its obligation to construe pro se submissions leniently, the court overlooks Gray's noncompliance with Local Rule 56.1 and construes the limited evidentiary materials he has submitted in the light most favorable to him. Where, however, Gray has failed to deny Defendant's statement of facts, the court will deem the facts found in Defendant's 56.1(a) statement admitted to the extent that they are supported by the record. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006).

**I.     Access to Cleaning Supplies**

Plaintiff claims that Defendant failed to provide him with adequate cleaning supplies. (Compl. ¶ 13.) Inmates at Stateville, including Plaintiff, are provided with cleaning supplies at least every few weeks unless the prison is on "lockdown." (Def.'s 56.1 ¶ 7.) Plaintiff maintains, however, that these supplies are diluted to the point that they are "primarily water." (Gray Dep. 13:10-15, Ex. B to Def.'s Mem. [41].) Since at least September 12, 2012, Defendant has also prohibited prisoners from storing "[t]oxic chemicals (scouring powder, liquid soap, bleach, etc.)" in their cells. (Warden's Bulletin of 9/21/12, Ex. B. to Pl.'s Response [48].) Stateville inmates are not provided with mops or brooms, so Plaintiff is forced to use his personal towels to clean his cell. (Gray Dep. 12:8-21.) The prison provides inmates with just one such towel every eight months; additional towels are available for purchase at the commissary. (Def.'s 56.1 ¶ 7.) Plaintiff has offered no evidence that his limited access to cleaning supplies has made him sick or otherwise impacted him physically.

## II. Exposure to Lead Paint and Mold

Plaintiff further alleges that he has been exposed to lead paint at Stateville. Specifically, Gray claims that lead paint is peeling from his cell's "walls, floors, and . . . bars." (Comp. ¶ 16.) Plaintiff does not know whether or not the paint has ever been tested for lead, but he believes it is lead-based because of what he refers to as its "distinctive feel" and because "lead paint is what they used in the '70s and '80s." (Gray Dep. 21:13-24:19.) Plaintiff's cell walls were repainted in early 2012, and he does not believe that the new paint contains lead. (Def.'s 56.1 ¶ 9.) The allegedly lead-based paint on Plaintiff's cell bars has been completely removed. (Gray Dep. 26:1-8.) Despite these changes, Plaintiff says he continues to be exposed to the lead-based paint underneath due to "pockets of condensation" that have caused the new water-based paint to peel off his cell's walls. (Compl. ¶ 17.) Gray fears that the lead paint in his cell may have exposed him to numerous toxic compounds, including lead acetate, lead carbonate, lead chromate, barium sulfate, and cadmium. (*Id.*) He fears possible additional long-term health risks associated with lead paint exposure. (*Id.* at 26:21-27:18, 35:3-15.) He acknowledges, however, that he has no proof that any of these dangerous compounds are found in the paint used at Stateville. (Gray Dep. 31:16-23.) He asserts that these chemicals caused him to suffer from Painter's Colic (a form of lead poisoning), which he describes as "an intestinal disease with symptoms of nausea." (*Id.* at 34:16-38:1.) Gray has never been diagnosed with Painter's Colic or any other illness resulting from exposure to lead paint, however, and medical records he presented make no reference to any such condition.

Plaintiff also alleges that the paint at Stateville is dangerously flammable. (Compl. ¶ 19.) On at least two occasions, Plaintiff witnessed fires in his prison unit that spread to the paint on the walls. (Gray Dep. 43:13-44:10.) Plaintiff does not believe that the new, water-based paint in his cell is flammable, however, and he has never been injured as a result of the paint's flammability. (*Id.* at 44:11-18; 45:3-16.)

According to Plaintiff, the peeling paint has also exposed him to what he described as "colonies of toxic black mold." (Compl. ¶ 18.) Despite attempts to eradicate the mold with the disinfectant supplied by Stateville, Plaintiff has been unable to remove the substance from his walls. (Gray Dep. 42:2-11.) Gray alleges that this mold is a "toxin[]" that is "detrimental" to his health (*Id.* at 42:12-22), but he has no evidence that substantiates his assertion that the substance is hazardous. (Def.'s ¶ 11.) The mold has never made Plaintiff sick or otherwise affected him. (*Id.*)

### III.  Inadequate Ventilation

Gray suffers from asthma. (Pl.'s Medical Records, Ex. F to Pl.'s Rep.) He alleges that his asthmatic attacks are triggered, either in whole or in part, by Stateville's "inadequate air circulation." (Pl.'s Reply at 9.) Prior to his incarceration at Stateville, Gray had not suffered an asthmatic attack for at least seven years. (Gray Dep. 49:3-50:5.) Plaintiff's cell has no windows, a single air vent, and a 10-inch fan (Gray Dep. 48:14-19; Pl.'s Reply at 9.) Until recently, however, the vent was covered by a steel plate that blocked the flow of air to Plaintiff's cell.[1] (Def.'s 56.1 ¶ 13.)

### IV.  Insect and Bird Infestations

Plaintiff claims that Stateville is "infested" with various species of insects, including cockroaches (Gray Dep. 60:8-18), spiders (*id.* at 61:17-22), ants (*id.* at 61:5-12), flies (*id.* at 62:20-24), gnats (*id.* at 63:4-6), mosquitoes (*id.* at 62:8-10), and moths. (*Id.* at 63:10-12.) Mosquitoes and ants are seasonal, appearing in the prison only during summer months (*id.* at 61:5-12, 62:17-19), while Plaintiff kills "a couple" cockroaches and spiders in his cell at least "every other day." (*Id.* at 60:15-18, 61:17-22.) With the exception of mosquito bites, which occur "daily" throughout the summer (*Id.* at 62:8-19), Plaintiff has not been bitten or otherwise physically affected by the presence of these pests. (Def.'s 56.1 ¶¶ 14-18.)

---

[1] Defendant's 56.1 statement suggests that the steel plate was removed on July 16, 2012, but the deposition testimony it cites for that proposition does not refer to the timing of the steel plate's removal.

4

In addition to these insects, Plaintiff alleges that Stateville is home to large populations of birds and mice. (Compl. ¶ 24.) Birds enter the prison through broken windows (*id.*), while the mice enter through Stateville's ventilation ducts. (Gray Dep. 57:23-58:11.) Plaintiff's cell house, in particular, contains approximately six bird nests and fifteen birds. (*Id.* 52:18-23, 57:10-19.) Gray claims that these birds pose a significant health risk, as they regularly deposit their feces on the prison's walls, floors, and the carts used to distribute the inmates' daily breakfast trays. (*Id.* at 56:13-20; Compl. ¶ 24.) Plaintiff has never found bird feces on his own food tray. (Gray Dep. 56:21-23.) Mice have eaten Plaintiff's food and soiled his clothing, but he has never been bitten or otherwise affected by the mice in Stateville. (*Id.* at 58:19-59:16.)

Under Defendant's guidance, Stateville has taken steps to remedy the prison's pest infestations. Prison workers remove the bird nests from Plaintiff's cell house approximately once every three months, while avian fecal matter is removed from the floors every other day. (Def.'s 56.1 ¶ 20.) Critter Ridder, a professional pest control service provider, has also visited Stateville on a monthly basis since at least January 2008. (Critter Ridder, Inc. Invoices, Ex. D to Def.'s Mem.)

## V.  Constant Cell Lighting

Plaintiff further alleges that the cell house lights are "beaming 24 hours a day . . . mak[ing] it nearly impossible to sleep properly or healthily." (Compl. ¶ 27.) The prison's interior lights are mounted on both the ceiling and walls at five-foot intervals. (Gray Dep. 65:9-66:1.) Plaintiff acknowledges that one purpose of the constant lighting is to allow guards to monitor prisoners. (*Id.* at 66:12-24.)

Plaintiff has difficulty sleeping, and he sleeps approximately five hours per night. (*Id.* at 68:17-20.) Gray believes, however, that his trouble sleeping is due to the impact of incarceration generally, not the particular conditions at Stateville. (*Id.* at 68:21-69:4.) While Plaintiff thinks that sleep deprivation can have "a negative impact" physically, he has not suffered any symptoms from a lack of sleep. (*Id.* at 69:14-23.) Further, Plaintiff believes that "five hours is a good enough

5

amount of time to get rest." (*Id.* at 70:2-5.)

**VI.    Contaminated Water**

According to Plaintiff, Stateville's drinking and cooking water suffers from "systemic contamination[]." (Compl. ¶¶ 33-38.) Gray claims that by drinking this contaminated water (and eating food prepared with it) since 2000, he has been exposed to "radioactive contaminants which are known to the scientific community to be carcinogens." (Compl. ¶ 34.) Plaintiff has never had cancer, nor does he believe he currently has cancer. (Def.'s 56.1 ¶ 10.) In addition to water, Plaintiff is provided with juice and milk for hydration. (*Id.* ¶ 23.)

To corroborate his allegations, Plaintiff cites to a number of sources that have found radium in Stateville's water in excess of established limits. One such document, a 2003 Warden Bulletin, reported that Stateville's water supply contained radium (a radioactive mineral) in excess of the Illinois Pollution Control Board maximum. (Warden's Bulletin No. 2003-16 of 2/13/2003, Ex. 3 to Compl.) The bulletin clarified, however, that the condition did not pose an "immediate hazard to water consumers." (*Id.*) Another report from the Illinois Environmental Protection Agency ("IEPA") indicated that Stateville planned to resolve its violations by "completely upgrading the water main system throughout the facility . . . by November 2003." (2002 Violation Summary Table, Ex. 6 to Compl.) Defendant suggests that none of the violations documented by Plaintiff's evidence are relevant, however, as they refer exclusively to periods before he became warden of the prison in December 2009. (Def.'s Mem. at 6.)

Plaintiff filed a grievance in 2010 complaining about the radium level in the prison's water supply. (Offender's Grievance of 1/7/10, Ex. 4 to Compl.) In response, Defendant found that no action was necessary, as Stateville's water, which originates in the city of Crest Hill, is tested twice for radium (once by Crest Hill and again by the prison) before reaching inmates. (*Id.*)

**VII.    Double-Man Cells**

Plaintiff also alleges that "double-man cell" living conditions at Stateville are unconstitutional.

(Compl. ¶ 28.) He claims that the prison's cells "fall below the minimum size prescribed by both courts and corrections experts for even one inmate,"[2] and that Stateville compounds this problem by offering prisoners insufficient opportunities for regular time outside their cells. (*Id.* ¶¶ 29-30.)

Each cell Plaintiff has occupied at Stateville has been approximately fifteen feet long, five feet wide, and seven feet tall (i.e., roughly seventy-five square feet).[3] (Gray Dep. 72:15-19.) Gray did not have a cellmate at the time of his deposition, but he states that the close living conditions of double-man cell living provide insufficient space to inmates and "breeds . . . conflict." (*Id.* at 77:1-78:7.) Plaintiff spends the vast majority of his time in his cell, leaving almost exclusively for "yard" (one-and-a-half hours per day, two times per week), the library (one-and-a-half hours per trip), Bible study (Fridays and Saturdays), and a creative writing class (every other Tuesday).[4] (*Id.* at 73:22-74:11, 75:19-23.) Gray also has the option of leaving his cell for lunch and dinner, but chooses not to in order to avoid "antagonistic" guards. (*Id.* at 74:12-24.)

Having a cellmate has never affected the cleanliness of Plaintiff's cell, nor has it influenced

---

[2] Plaintiff cites to 24-year-old standards promulgated by the American Correctional Association that suggest inmates who spend more than ten hours per day in their cells should be provided at least eighty square feet of cell space. American Correctional Association, Standards for Adult Correctional Institutions, standard 2-4129 (Supp.1989). Similarly, American Public Health Association standards from 1976 suggested a minimum of sixty square feet per person in single cells. American Public Health Association, Standards for Health Services in Correctional Institutions (1976). Although expert recommendations like these "do not establish the constitutional minima," they do provide some perspective on Stateville's conditions. *Rhodes v.* Chapman, 452 U.S. 338, 348 n. 13 (1981). In addition, Plaintiff cites to earlier cases from federal district courts in Missouri and Pennsylvania (1) requiring single-occupancy cells with seventy square feet, *Ahrens v. Thomas*, 434 F.Supp. 873, 901 (W.D. Mo. 1977); and (2) observing that [w]hile no consensus among courts exists regarding the minimum number of square feet . . . [a] review of the cases indicates that the [average] figure is sixty to seventy square feet per cell." *Inmates of Allegheny County Jail v. Wecht*, 699 F. Supp. 1137, 1143 (W.D. Pa. 1988), *aff'd in part*, 874 F.2d 147 (3rd Cir. 1989).

[3] Plaintiff is unable to provide exact measurements of his cell because regulations prohibit him from possessing measuring instruments. Such devices are banned on the theory that allowing inmates to calculate their cells' square footage would create a "security risk for escape." (Pl.'s Response at 17.)

[4] Plaintiff did not state how frequently he has a "library day" or how long his Bible study and creative writing classes last.

his access to cleaning supplies, meals, medical care, prison employment, or educational programming. (*Id.* at 79:21-80:13.) Nor has the presence of a cellmate caused Plaintiff to experience any physical pain. (*Id.* at 80:14-16.) Gray maintains, however, that, in conjunction with the other conditions he contests (detailed above), his circumstances at Stateville rise to the level of an Eighth Amendment violation. (Pl.'s Reply at 18.)

## VIII. Administrative Grievance

In April 2011, Plaintiff filed an emergency grievance with the Illinois Department of Corrections ("IDOC"), complaining about the conditions at Stateville. (Offender's Grievance of 4/14/11, Ex. 4 to Compl.) Plaintiff's grievance was based on claims substantially similar to those alleged in the instant case. Defendant denied Gray's grievance on the grounds that it did not constitute an emergency. (Gray Dep. 90:8-19.) Plaintiff then re-filed his complaints as a regular grievance with his counselor, who also denied it.[5] (*Id.* at 91:1-4; Letter to Unknown from Gray of 5/3/11, Ex. 8 to Compl.) After this denial, Gray appealed the decision to grievance officer Anna McBee who issued a final decision on April 13, 2012, concluding that "[n]o action" was required in response to Plaintiff's complaints. (Response to Committed Person's Grievance of 4/13/12, Ex. K to Pl.'s Reply.) Approximately five months after filing his non-emergency grievance (but prior to receiving McBee's decision), Plaintiff filed the instant lawsuit.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2011). In determining whether genuine factual issues exist, a court must construe all evidence and draw all reasonable inferences

---

[5] Neither party has provided a copy of the initial denial by Plaintiff's counselor.

in the light most favorable to the non-moving party. *Gruenberg v. Gempeler*, 697 F.3d 573, 578 (7th Cir. 2012). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *Rosario*, 670 F.3d at 820 (internal quotation marks and citation omitted). Therefore, parties must rely on admissible evidence to support their motions for or against summary judgment. *See MMG Financial Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) (upholding summary judgment against party that relied solely on excluded hearsay evidence to prove the existence of a genuine factual dispute).

## II.     Eighth Amendment Standard

The standard for analyzing an Eighth Amendment claim in the prison context is well-established: a prison official is liable for denying a prisoner of his or her basic human needs, but only if the official is aware of and deliberately indifferent to an objectively serious risk of harm. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). Thus, an inmate's constitutional challenge to prison conditions requires a two-part examination. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). The court must first determine whether the conditions at issue were "sufficiently serious" such that "a prison official's act or omission result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 832, 834 (1994) (internal quotation marks omitted); *see also Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). Prison conditions may be uncomfortable and harsh without violating the Eighth Amendment. *See Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Farmer*, 511 U.S. at 832). Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Henderson v. Sheahan*, 196 F.3d 849, 845 (7th Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

Only where the inmate succeeds in establishing that the conditions were sufficiently serious must the court examine whether prison officials acted with "deliberate indifference" to the conditions

9

in question. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Whitman*, 368 F.3d at 934. "Deliberate indifference" occurs where an official knows that an inmate faces a substantial risk of serious harm, and yet disregards that risk by failing to take reasonable measures to address it. *See Farmer*, 511 U.S. at 847; *see also Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995).

A.   **Sufficiently Serious Conditions**

Defendant's statement of undisputed facts relies almost exclusively on Plaintiff Gray's deposition testimony. In that testimony, Plaintiff acknowledged that he has not suffered harm from the conditions of his confinement. He fears, however, that his incarceration will lead to health problems in the long term. The court believes that Plaintiff's concerns about his long-term health are genuine, but these concerns by themselves are insufficient to substantiate an Eighth Amendment claim. As explained below, none of the conditions to which Gray objects are sufficiently serious to give rise to a constitutional conditions-of-confinement claim.

1.   **Access to Cleaning Supplies[6]**

Plaintiff argues that he has inadequate access to cleaning supplies. (Compl. ¶¶ 13-15.) Although the deprivation of cleaning supplies may amount to a constitutional violation, the

---

[6] Plaintiff refers throughout his response brief to excerpts from a 2011 John Howard Association ("JHA") Monitoring Report. (John Howard Monitoring Report of Stateville Correctional Center (hereinafter "JHA Report"), Exs. A & E to Pl.'s Response.) The report catalogs conditions at Stateville based on inspections and observations made by JHA employees and "citizen observers." Monitoring Report of Stateville Correctional Center, John Howard Association (July 12, 2011) http://www.thejha.org/sites/default/files/ JHA_Stateville_Monitoring_Report.pdf. This report is insufficient to defeat summary judgment to the extent that it relies on the hearsay statements of unnamed third parties. Further, the JHA report, as Defendant points out, refers to Stateville's conditions generally, not to Plaintiff's cell in particular, and there is no evidence that Defendant was aware of any of the conditions described in the report. Notably, in some respects the report actually belies Plaintiff's allegations of unconstitutional conditions. As to cleaning supplies, for instance, the JHA Report suggests that Stateville has a policy of distributing supplies weekly, but that "staff members are sometimes lax in handing out these supplies." (JHA Report, Ex. A to Pl.'s Reply.) This is insufficient to sustain Plaintiff's constitutional claim.

10

circumstances in this case do not rise to that level.[7]  *Compare Vinning-El v. Long*, 482 F.3d 923, 923-25 (7th Cir. 2007) (reversing summary judgment for prison official where inmate was deprived of basic sanitation items while in a cell for six days in which blood and feces was smeared on the walls, water covered the floor, and the sink and toilet did not function), *with Allen v. Hardy*, No 11 C 4147, 2012 WL 5363415, at * 5 (N.D. Ill. Oct. 26, 2012) (lack of cleaning supplies did not result in constitutional violation because plaintiff was able to receive cleaning supplies without incident for the last year and was always able to clean cell with soap and personal towel); *Sanchez v. Walker*, No. 09 C 2289, 2010 WL 5313815, at * 9 (N.D. Ill. Dec. 17, 2010) (lack of cleaning supplies did not result in constitutional violation because plaintiff could have used available water and clothing to clean his cell). Gray contends that Stateville distributes "inadequate," "watered down" cleaning supplies, and that the difficulty is exacerbated by Defendant's policy prohibiting prisoners from keeping chemical cleaning supplies in their cells. (Pl.'s Response at 5.) He acknowledges, however, that cleaning supplies are distributed "at least every few weeks" (Gray Dep. 19:6-12); and, although he has no mop or broom, Gray does have access to towels for use in cleaning his cell. (*Id.* at 12:8-21.)

In addition, Plaintiff fails to make a triable showing that the lack of cleaning supplies has caused him any harm. Gray testified that his access to cleaning supplies only affects his health in conjunction with the presence of birds and other pests (discussed below). (Gray Dep. 18:9-21.)

---

[7]   Plaintiff cites to a number of decisions for the proposition that a lack of cleaning supplies or dirty living conditions may constitute a constitutional violation. (Pl.'s Reply at 5.) Most of these cases are not binding on this court, as they come from other district courts. One of the cases on which Plaintiff relies was later reversed. *Carver v. Knox County*, 753 F.Supp. 1370 (E.D. Tenn. 1989), *aff'd in part, rev'd in part*, 887 F.2d 1287 (6th Cir. 1989). In any event, the conditions described in those cases were significantly worse than those that Plaintiff describes. *See Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) (vacating summary judgment for defendant prison officials where inmate's walls were smeared with "human defecation" and no cleaning supplies or water were provided for despite inmate's requests); *Touissant v. McCarthy*, 597 F. Supp. 1388, 1411 (finding a constitutional violation where prison cells lacked solid waste containers, service spaces smelled of raw sewage, and other areas were encrusted with rotting garbage).

He offers no evidence, however, to support the notion that the presence of vermin, the availability of cleaning supplies, or the combination thereof has directly harmed him.

**2.    Exposure to Lead Paint and Mold[8]**

Plaintiff further alleges that the state of his cell walls constitutes an unconstitutional living condition. Specifically, Gray claims that he has been exposed to flammable, toxic lead paint and toxic black mold. Plaintiff admitted in his deposition, however, that (1) he does not know if the paint at Stateville contains lead or was ever tested for lead; (2) he does not know if he was ever exposed to any harmful chemicals from the paint; (3) he does not know if the black mold is toxic and he has never become sick from the mold; and (4) he has never been affected by the alleged flammable paint.

Plaintiff's reply brief also cites to multiple Safety and Sanitation Reports from the IDOC that span years from 2008 to 2012. (Ex. D to Pl.'s Reply.) Gray cites to these exhibits in their entirety without any indication as to how they support his allegations, and the court is unable to find any reference to toxic black mold or lead paint within these documents. Given Plaintiff's deposition testimony and the lack of other evidence in the record to substantiate his claims about lead paint and mold, Gray has failed to establish that the conditions of his cell walls establish a constitutional violation.

**3.    Inadequate Ventilation**

Plaintiff alleges that Stateville provides inadequate air ventilation that triggers his asthmatic attacks. He claims that air circulation is blocked by steel plates that cover the vents in many of the prison's cells. In his deposition, however, Plaintiff testified that his cell's air vent is no longer blocked and that he has a ten-inch fan to provide additional air circulation. While Plaintiff cites to

---

[8]    In his response brief, Plaintiff again cites to excerpts of the 2011 JHA Report to support his claims as to lead paint and mold. The portions of that report submitted by Plaitniff do not appear to mention paint or mold.

medical records that confirm he suffers from asthma, he offers no evidence that suggests a causal connection between Stateville's conditions and his asthmatic attacks. In fact, the only evidence of causation that Gray does offer is his own deposition testimony that he did not suffer an asthma attack for several years prior to his confinement at Stateville. Plaintiff's unsupported allegations do not establish a constitutional violation. *See Walker v. Dart*, No. 09 C 1742, 2010 WL 3307079, at * 6 (N.D. Ill. Aug. 19, 2010) (inmate's subjective belief that poor air circulation caused coughing and spitting up of blood insufficient to defeat summary judgment).

**4.    Insect and Bird Infestations**

Plaintiff also claims that Stateville is "infested" with birds, mice, roaches, ants, spiders, and seasonal flying insects like mosquitoes, flies, gnats, and moths. Gray alleges that these pests' presence, and particularly the bird feces, create unconstitutional living conditions. Plaintiff has observed all of the pests listed, but he testified that he has been harmed by these pests in only two ways: (1) he is frequently bitten by mosquitoes during the summer, and (2) mice have eaten his foot and damaged his clothing. Gray has never been bitten or physically harmed by any of the pests other than mosquitoes.

As to the presence of birds and their feces, Gray testified that any bird excrement is removed when prison floors are washed every other day and bird nests are removed from the once every three months. Notably, Plaintiff admits that he has never suffered any type of illness or been otherwise affected by the birds or their feces at Stateville. Plaintiff fears that exposure to avian fecal matter may cause long-term health issues, but his subjective fears of future harm, unsupported by admissible evidence, are insufficient to support a conditions-of-confinement claim. The court notes, further, that Stateville officials have taken affirmative steps to exterminate the pests. For instance, a professional pest control company visits Stateville on a monthly basis and the Safety and Sanitation Reports cited in Plaintiff's response brief demonstrate ongoing efforts to fix screens and wash floors in hopes of keeping birds, mice, and insects out of the prison.

The existence of pests and birds does not establish an objectively serious condition, particularly where, as here, the prison actively seeks to prevent their presence. *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (plaintiff must demonstrate a persistent problem with pests and "significant physical harm" to prevail on Section 1983 claim regarding pest infestation). Valid claims of unconstitutional conditions based on pest infestation involve far more extreme circumstances. *See, e.g., White v. Monohan*, 388 (7th Cir. 2009) (five-year exposure to roaches, mice, bees, and wasps that stung and bit detainee so frequently as to leave scars and internal injuries stated a claim of unconstitutional condition of confinement in a "close case"); *Antonelli*, 81 F.3d at 1431 (7th Cir. 1996) (allegation that roaches and mice were rampant, and regularly crawled on the inmate's body stated a claim of an unconstitutional conditions of confinement, particularly where the jail had sprayed only twice during a 16-month period); *cf. Moore v. Monahan*, No. 06 C 6088, 2009 WL 310963 at *7 (N.D. Ill. Feb. 9, 2009) (five-and-one-half months of exposure to insects, during which inmate was never bitten, did not amount to a constitutional violation).

5. **Constant Cell Lighting**

Plaintiff also alleges that the cell house lights are "beaming 24 hours a day." He claims that the constant lighting "makes it nearly impossible to sleep properly or healthily." He concedes, however, that lights in parts of the cell houses are on twenty-four hours per day for security purposes. He also concedes that five hours of sleep is "good enough" and that any lack of sleep is not caused by the lights but because of the fact that he is incarcerated.

Plaintiff has not demonstrated that the lighting conditions rise to a sufficiently serious deprivation. *See Vasquez v. Frank*, 290 F. Appx. 927, 929 (7th Cir. 2008) (twenty-four-hour lighting for security reasons did not constitute an extreme deprivation).

6. **Contaminated Water**

Plaintiff alleges that there are "systemic contaminations in Stateville drinking and cooking water." In his response, Gray cites to two exhibits attached to his complaint to demonstrate that

14

the water supply at Stateville is not fit to drink: a 2001 Warden Bulletin and the results of IEPA testing in 2002. Plaintiff does not address, however, how these dated, multi-page studies support his claim that conditions are unsafe during his own incarceration. In fact, the 2002 IEPA report specifically states that Stateville was working to completely overhaul its water main by November 2003 in order to improve the prison's water quality.

Notably, the Seventh Circuit dealt with the constitutionality of the Stateville water supply prior to the water main improvements at the prison. In affirming the dismissal of a prisoner's claim regarding the water at Stateville at that time, the Seventh Circuit found that "[t]he Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001). Plaintiff provides no evidence that the water supply at Stateville is worse than it was at the time of that decision, nor has he established the existence of a systemic contamination that constitutes a violation of his constitutional rights.

### 7. Double-Man Cells

Lastly, Plaintiff claims that the double-man cell living conditions at Stateville are unconstitutional. Double celling, by itself, does not amount to a constitutional violation, so long as it does "not lead to deprivations of essential food, medical care, or sanitation" and does not "increase violence among inmates or create other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348. At the time of his deposition, Plaintiff did not live with a cellmate at all. He acknowledged, further, that having a cellmate in the past has not affected the cleanliness of Plaintiff's cell, nor has it influenced his access to cleaning supplies, meals, medical care, prison employment, or educational programming. Nor has the presence of a cellmate caused Plaintiff to experience any physical harm. Thus, Plaintiff has not demonstrated that his double-celled living conditions constitute a constitutional violation.

### B. Deliberate Indifference

None of the conditions in Plaintiff's complaint are sufficiently serious to support a conditions-of-confinement claim. As such, the court need not address the issue of deliberate indifference. The court notes, however, that Plaintiff's own testimony and other evidence he himself offers reflects that Defendant has in fact taken steps to ameliorate conditions at Stateville. *See Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (evidence of an extermination program on a monthly basis indicted a lack of deliberate indifference).

Based on the reasoning above, the undisputed evidence shows that the conditions of Plaintiff's incarceration at Stateville are not so harsh as to constitute a violation of the Eighth Amendment.

### III. Joinder of Additional Plaintiffs

Plaintiff also moved to join additional plaintiffs to this lawsuit. Specifically, he seeks to join fellow Stateville inmates Lester Dobbey and Ryan Miller, both of whom have also filed individual lawsuits against Warden Hardy alleging Eighth Amendment violations. As Plaintiff's claims cannot survive summary judgment, his motion to join Dobbey and Miller is denied.

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment [40] is granted. Plaintiff's motion to join additional plaintiffs [51] is denied as moot.

ENTER:

Dated: September 30, 2013

_____
REBECCA R. PALLMEYER
United States District Judge